**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| GREG RICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO: 1:07-CV-180-TS |
| | ) | |
| CITY OF KENDALLVILLE, CITY | ) | |
| OF KENDALLVILLE WATER | ) | |
| DEPARTMENT, and SCOTT MOSLEY, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 44], filed by the

Defendants on August 22, 2008. This Motion has been fully briefed and is now ripe for ruling.

## BACKGROUND

On July 23, 2007, the Plaintiff, Greg Rice, instituted this lawsuit by filing his Complaint

and Demand for Jury Trial [DE 1]. On September 10, the Defendants, City of Kendallville, City

of Kendallville Water Department, and Scott Mosley, in his individual capacity, filed their

Answer [DE 13]. On November 29, the Plaintiff's Amended Complaint and Demand for Jury

Trial [DE 22] was filed. In his Amended Complaint, the Plaintiff asserts three claims against the

Defendants. First, the Plaintiff alleges that the Defendants violated Title VII by discriminating

against him on the basis of religion. Second, the Plaintiff claims that the Defendant's violated his

equal protection rights by treating him differently based on religion. Third, the Plaintiff alleges

that he suffered damages as a result of defamatory statements by the Defendants. On December

10, the Defendants filed their Answer to Amended Complaint [DE 24], and on June 23, 2008, their Amended Answer to Amended Complaint [DE 43] was filed.

On August 22, the Defendants filed a Motion for Summary Judgment and Designation of Evidence [DE 44], as well as a Memorandum in Support [DE 45]. On October 3, the Plaintiff filed a Response [DE 46], a Statement of Genuine Issues [DE 46-2], as well as a Designation of Evidence [DE 47]. On October 24, the Defendants filed a Reply Brief [DE 48]. On February 9, 2009, the Defendants filed a Supplemental Brief [DE 50], and on February 21, the Plaintiff filed a Supplemental Response [DE 51].

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If appropriate, summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a court should

enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

## FACTS

On November 16, 2006, the Plaintiff's employment as a distribution operator with the Defendant City of Kendallville Water Department was terminated. If one believes the Plaintiff's perspective on the termination of his employment, his supervisor, Defendant Scott Mosley, disagreed with the Plaintiff's religious beliefs and lifestyle, treated employees in the Water Department differently based upon religion, and terminated the Plaintiff's employment as the culmination of his religious discrimination against the Plaintiff. If one believes the perspective offered by the Defendants, the Plaintiff was insubordinate and failed to exhibit good behavior. Both parties have come forward with a substantial body of evidence to support their respective perspectives. However, at this stage of the litigation, the Court is not to weigh the evidence or make credibility determinations; instead, the Court is to view the facts in the light most favorable to the Plaintiff, the non-movant, and to draw all reasonable inferences in his favor.

The Plaintiff became an employee of the City of Kendallville Water Department in March 1991. Defendant Mosley became the Superintendent of the Water Department in or about September 2002. Defendant Mosley was also a pastor at Grace Christian Church. Although the Plaintiff has visited the church four or five times, he does not subscribe to the same religious beliefs or practices as Defendant Mosley.

As Superintendent of the Water Department, Defendant Mosely has participated in the hiring of employees to work in the Water Department. During the period that Defendant Mosley supervised the Plaintiff, Defendant Mosely hired (apparently with the approval of the Board of Public Works and Safety) Troy Climie, Leslie ("Darrel") Nickles, and Andrew Cunningham. Climie, Nickles, and Cunningham (as well as Jim Stevens, another Water Department employee) have been regular attendees at the church Defendant Mosley serves, and Nickles and Cunningham have held leadership roles at the church. There are other Water Department employees who do not attend Defendant Mosley's church.

The Plaintiff was written up for attendance issues on October 24, 2000, and January 8, 2001. On April 25, 2003, Defendant Mosley gave the Plaintiff a written warning on attendance issues. On January 30, 2004, and June 17, 2004, Defendant Mosley gave the Plaintiff written warnings for neglect of duty. On July 10, 2005, Defendant Mosley suspended the Plaintiff without pay for one day for dishonesty and insubordination for violating the Internet policy and lying about it, but Cunningham was not disciplined or suspended for violating the same Internet policy. The Plaintiff thought Defendant Mosley was "trying to build a paper trail on [him]." (Pl.'s Dep. 107.)

On November 1, 2004, and December 15, 2005, the Plaintiff received positive employment evaluations from Defendant Mosley. In December 2005, according to the Plaintiff's employment evaluation, Defendant Mosley considered the Plaintiff "a great success story" and a "good employee," and commented that the Plaintiff "is and will be a great asset to the City of Kendallville." (Pl.'s Ex. A-6 at 8, DE 47-11.) Defendant Mosley thought the Plaintiff's overall performance for 2006 was satisfactory. Between July 2005 and November 14, 2006, the Plaintiff received no verbal or written warnings. In October 2006, Defendant Mosley gave the Plaintiff eight hours of compensatory time for doing a good job and working on a special project. In Defendant Mosley's words, the Plaintiff made a "great effort," "worked through breaks, [and] worked long hours." (Mosley Dep. 79.) Despite a policy of removing discipline from employee files after three years as a means of encouraging employees, Defendant Mosley retained discipline in the Plaintiff's file beyond this three-year period.

In the workplace, Defendant Mosley displayed religious signs and a poster of Jesus, and he placed a note about overtime that stated: "Remember, you are Christians. Be true to your word." (Pl.'s Ex. E at 3–4, DE 47-19; Climie Dep. 17; Mosley Aff. ¶ 8, DE 44-2; Mosley Dep. 33.) Computers used by employees were set to require Bible-related or religious-related passwords. (Mosley Dep. 36; Pl.'s Dep. 104.) Defendant Mosley testified that he used such passwords because they were "easy for [him] to remember." (Mosley Dep. 36.) In front of other employees, Defendant Mosley commented that the Plaintiff "was living in sin" and "lived a life of sin, drunkenness, and carousing" and that he was a "drunkard," a "whoremonger," a "carouser," and a "sinner." (Pl.'s Ex. E at 3–4, DE 47-19; Pl.'s Dep. 78–79, 82–83; Climie Dep. 25–27.) He told the Plaintiff the following: "Jesus only died for you, and you still live the way

you do"; and "the only way God is going to get you into line is for you to get hit hard. You need to be hit really hard." (Pl.'s Dep. 143, 180–81; Climie Dep. 28.) Additionally, he explained to the Plaintiff that "[i]f living [sic] a better life, we could be like Jesus and walk on water." (Pl.'s Ex. E at 3–4, DE 47-19.) Defendant Mosley's comments also related to women needing to be submissive, women in the Clerk's office being motivated by a desire to control and manipulate men and driven to have power over men in contradiction to the biblical teachings, and a woman being punished for the way she conducted her life. (Pl.'s Ex. E at 3–4, DE 47-19; Pl.'s Dep. 141; Climie Dep. 29.) Employees were told that employees in the Old Testament called their bosses "master." (Pl.'s Ex. E at 3–4, DE 47-19; Climie Dep. 29.) In addition to expressing his view that the Plaintiff was living a life of sin for engaging in premarital sex, Defendant Mosley told the Plaintiff and his girlfriend (when she visited the workplace) that they should not be alone together for at least six months and should not engage in premarital sex. (Climie Dep. 31–32; Pl.'s Ex. E at 3–4, DE 47-19; Pl.'s Dep. 79–80.) A few weeks before he terminated the Plaintiff's employment, Defendant Mosley told the Plaintiff to marry his girlfriend or stop dating her, that the Plaintiff was leading an immoral life, and that Christ had died for him. (Pl.'s Decl. ¶ 4, DE 47-18.) Although the Plaintiff objected on occasion, Defendant Mosley told him to "keep [his] mouth shut," to "drop it or you will be dealt with on paper," and to "stop complaining or you will lose your job." (Pl.'s Ex. E at 5–6, DE 47-19.)

On October 19, 2006, Defendant Mosley implemented a new written policy governing the interactions of Water Department employees with employees in the Clerk's office and other City departments. A verbal policy had previously been in place, but the written policy was intended to address some continuing problems, to encourage courteous interactions, and to

counsel against arguments and confrontations. Water Department employees were also directed not to go behind the counter space at the Clerk's office. Prior to the implementation of the policy, the Plaintiff had not been counseled or disciplined for any problematic interactions with Clerk's office employees. Just a few months before the written policy was implemented, Climie had an altercation with Clerk's office staff. Although Defendant Mosley instructed Climie not to go to the Clerk's office for one month, Climie was not disciplined for the incident.

In November 2006, Defendant Mosley supervised the Plaintiff, David Mooney, Taulbee Thacker, Climie, Stevens, Jeff Arnold, Nickles, Cunningham, and Erle Andrews. On November 14, the Plaintiff, Climie, and other distribution operators were reading meters. The recently installed new system for reading water meters had lingering problems, and not all addresses were entered into the system. By telephone, the Plaintiff contacted two employees of the Clerk's office several times to report addresses that had not been entered into the system and thus were not registered in the handheld devices. Soon thereafter, Defendant Mosley contacted the Plaintiff and told him to write down the information, and the Plaintiff complied with these instructions and did not call the Clerk's office. Later in the day, the Plaintiff picked up Climie who had also been reading meters. The Plaintiff called Defendant Mosely to ask if they could "get together and have a meeting" and discuss writing down the addresses. Defendant Mosley responded: "Now you listen to me. You let this issue drop or we'll deal with this on paper. Shut your stupid mouth." (Pl.'s Dep. 130.) Thinking the conversation was over after a pause and that Defendant Mosley had ended the call, the Plaintiff hung up his telephone and went back to work. Defendant Mosley called the Plaintiff and left the following message: "Either answer your phone when I call you or you are to leave it at home and carry a city radio." (Pl.'s Dep. 131.) The Plaintiff had

his city radio with him and a radio in the vehicle, but Defendant Mosley did not contact either. Defendant Mosley did not ask the Plaintiff to call him back, but he did call Climie, who told Defendant Mosley that he was present with the Plaintiff. Before hanging upon on Defendant Mosley, Climie yelled at him, stating: "You called me. . . I didn't call you." (Pl.'s Dep. 133.) Defendant Mosley did not call Climie back on the cell phone or any radio. Climie was never disciplined, suspended, or terminated for his conduct.

Later on November 14, the Plaintiff returned his meter reader to the Clerk's office, and an office staff member (perhaps sarcastically) asked him if he was having a happy day. In response, the Plaintiff asked the office staff member whether it was that difficult for the Clerk's office staff to write the missing information down when he called. The staff member directed him to write it down, and the Plaintiff responded with a remark about the help he had recently given the office. Before he left the Clerk's office and returned to the Water Department, the staff member told him not to "cop an attitude" with her. (Pl.'s Dep. 135.) Defendant Mosley's testimony presents the Plaintiff's conduct in a more negative light, including a suggestion that he used profanity as he exited the building. Climie has also had a verbal altercation with a Clerk's office staff member and violated Defendant Mosley's verbal policy, but he was never disciplined for his conduct.

At the Water Department, Defendant Mosley met the Plaintiff and told him, "You just couldn't keep your stupid mouth shut, could you? You just had to open your stupid mouth. Now, you're suspended for three (3) days." (Pl.'s Dep. 139.) The three-day suspension was to be without pay. Defendant Mosley moved toward the Plaintiff, placed his hand on the Plaintiff's shoulders, and pushed him. Clenching his fist, Defendant Mosley said, "Come on." (Pl.'s Dep.

140.) Defendant Mosley's version of this confrontation paints the Plaintiff as the one who got in Defendant Mosley's face and who was shouting and ranting. The Plaintiff did not have an opportunity to provide his version of the events to Defendant Mosley, and Defendant Mosley did not issue any written discipline for the suspension.

On November 15, the Plaintiff reported to work—he had not received any discipline in writing. Defendant Mosley apologized for his conduct, and the Plaintiff apologized for his reaction. After the Plaintiff suggested putting the November 14 incident behind them, Defendant Mosley responded in the affirmative. However, Defendant Mosley told the Plaintiff that he was not fired, but that he was suspended for three days. The Plaintiff indicated that he wanted to appeal the discipline. He presented Defendant Mosley with the complaint procedures in the Employee Handbook, but Defendant Mosley indicated it did not apply to the Plaintiff. Defendant Mosley asked the Plaintiff to submit a written statement about the November 14 events. Although the Plaintiff did not provide Mayor W. Suzanne Handshoe with information about the November 14 incident, he did ask the mayor if the complaint procedures applied to him, and she indicated that she believed they did but that she would need to consult the city attorney. At some point, Defendant Mosley spoke with Mayor Handshoe about the complaint procedures, the November 14 incident, and the Plaintiff's behavior and performance.

Defendant Mosley called the Plaintiff and asked him if he had completed the written statement, but the Plaintiff indicated that he was working through the complaint procedures. Defendant Mosley stated: "Well, now you've drug the mayor into this. I thought we weren't going to drag the mayor into this." (Pl.'s Dep. 155.) The Plaintiff responded that "the mayor ha[d] given instructions or advice not to put anything in writing yet until she receives

confirmation on how" he was to proceed. (Pl.'s Dep. 155.) Defendant Mosley told the Plaintiff to report to his office on November 16.

On November 16, Defendant Mosley asked the Plaintiff if he was willing to take full responsibility for his actions at the Clerk's office, but the Plaintiff indicated that he was not. Defendant Mosley then issued disciplinary paperwork concerning his suspension and termination. Without giving the Plaintiff an opportunity to explain, Defendant Mosley decided that the Plaintiff had "lied," had not kept the commitment to prepare a written statement, and had used the time to find a way to resist the reprimand. (Mosley Dep. 147.) Defendant Mosley had earlier instructed the Plaintiff that lying was wrong and violated his Christian beliefs, that lying can be a direct Satanic assault that displeases God, and that he hated lying. Not too long before these events, Defendant Mosley told the Plaintiff how much he hated deception and "how it goes against the will of God." (Pl.'s Decl. ¶ 7, DE 47-18.)

On November 16, Defendant Mosley terminated the Plaintiff's employment. Mayor Handshoe has stated that she and Defendant Mosley determined that the Plaintiff's behavior of insubordination and poor performance was a pattern, that attempts to coach and counsel had failed, and that they made a joint decision to terminate the Plaintiff's employment if he did not take full responsibility for his November 14 conduct. According to Defendant Mosley, the Plaintiff's employment was terminated for insubordination related to his altercation with the Clerk's office staff member, hanging up on Defendant Mosley, and not taking his call.

At all relevant times, Defendant Mosley knew that he was not to take any action that would violate an employee's right to religious freedom and that he could not discriminate against a subordinate employee because the employee's religious beliefs are different from his. Mayor

Handshoe is not a member of the church at which Defendant Mosley is a pastor, and she does not know the religious beliefs of Mosley or the Plaintiff.

The Plaintiff appealed the termination to the Board of Public Works and Safety. On January 9, 2007, the Board upheld the termination of the Plaintiff's employment. The minutes of the Board's meeting states that the Board decided "to uphold the actions of Superintendent, Scott Mosley to terminate employee, Greg Rice as of November 16, 2006." (Def.s' Ex. O, DE 44-2.) The Board found that the Plaintiff violated a written policy (confronting a Clerk's office employee), hung up the telephone on his supervisor, and did not respond to additional calls.

Additional facts will be presented as relevant to the Court's analysis.


## DISCUSSION

The Defendants contend that the Plaintiff's religious discrimination claims (under both Title VII and the Equal Protection Clause) and his defamation claim are without merit and that they are entitled to judgment as a matter of law on all of the Plaintiff's claims. In response, the Plaintiff concedes the defamation claim (indicating that he has decided to dismiss that claim against all Defendants), but otherwise comes forward with evidence urging that disputes regarding material facts remain and that the Defendants are not entitled to judgment as a matter of law. Considering the Plaintiff's concession on his defamation claim and his failure to respond as to this claim by setting out specific facts showing a genuine issue for trial, the Court will grant the Defendants' Motion for Summary Judgment as to the Plaintiff's defamation claim. The Court will address the other bases offered by the Defendants in support of their Motion for Summary Judgment on the Plaintiff's Title VII and Equal Protection claims.

**A.      The Plaintiff's Claims of Intentional Religious Discrimination**

The Plaintiff has brought suit under Title VII and the Equal Protection Clause of the Fourteenth Amendment (pursuant to 42 U.S.C. § 1983) claiming religious discrimination in the termination of his employment. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). The Fourteenth Amendment prohibits state and local governments from denying any person "the equal protection of the laws." U.S. Const. amend. XIV, § 1. Pursuant to 42 U.S.C. § 1983, individuals have a private right of action for violations of the Fourteenth Amendment. The Seventh Circuit has instructed that the same standards for proving intentional discrimination apply to Title VII and Section 1983 equal protection claims. *Bender v. Bellows & Bellows*, 515 F.3d 757, 768 n.7 (7th Cir. 2008). With a Title VII religious discrimination claim or a Section 1983 equal protection claim, the plaintiff may provide evidence either by offering direct proof of discrimination or by relying on the familiar indirect, burden-shifting method of analysis established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1037-38 (7th Cir. 2003). In any employment discrimination case, the central question is "whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. Gen'l Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005) (quotation marks and citation omitted).

The Defendants argue that the Plaintiff's Title VII and equal protection claims must fail.[1] They contend that there is no direct evidence of religious discrimination and that the Plaintiff must proceed under the burden-shifting analysis.[2] Although the Plaintiff contends that he can establish religious discrimination by the Defendants through the direct and indirect methods, he focuses on the indirect, burden-shifting method.

Under the direct method of proof, a plaintiff will survive summary judgment by showing sufficient evidence on which a jury could find that the employer took the adverse employment action for a discriminatory reason. *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir.

---

[1] In his Amended Complaint, the Plaintiff alleges that the "Defendants' unlawful actions were intentional, willful, and done in reckless disregard of [the Plaintiff's] rights as protected by Title VII." (Am. Compl. ¶ 41.) The Defendants argue that any Title VII discrimination claim asserted by the Plaintiff against Defendant Mosley, in his individual capacity, must be dismissed. The Plaintiff has not responded or otherwise opposed this argument. Under Seventh Circuit precedent, a plaintiff may not maintain a Title VII suit against a supervisor in his individual capacity. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998) (stating that Title VII's definition of employer does not include a supervisor acting in his individual capacity). For these reasons, the Court finds that the Plaintiff's Title VII discrimination claim against Defendant Mosley, in his individual capacity, should be dismissed.

The Defendants have also sought summary judgment on any harassment/hostile work environment claim asserted by the Plaintiff. Title VII prohibits religious discrimination in the form of workplace harassment, such as religious hostile work environment harassment, which involves conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. *Venters v. City of Delphi*, 123 F.3d 956, 975 (7th Cir. 1997). The Plaintiff has not responded to the Defendants' Motion for Summary Judgment as to any harassment/hostile work environment claim, and thus he has failed to set out specific facts showing a genuine issue for trial on any hostile work environment that he may have alleged. *See Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 342–43 (7th Cir. 2001) (holding that to survive a motion for summary judgment on a hostile work environment claim, a plaintiff must offer evidence that the aggravating conduct was "so severe or pervasive as to create an abusive working environment"). Considering the Plaintiff's failure to put forward evidence, to support with argument, and to point to genuine fact issues on a claim that the Defendants' conduct was so severe or pervasive as to create an abusive work environment, the Court will enter summary judgment for the Defendants on any hostile work environment claim that the Plaintiff may have asserted.

[2] As to the Plaintiff's Section 1983 equal protection claim, the Defendants urge that the Plaintiff's "class of one" claim must fail as a matter of law, and the Plaintiff responds with argument related to the "class of one" theory. Relying upon Supreme Court authority, the Seventh Circuit has observed that the "class of one" theory has no application in the public employment context. *United States v. Moore*, 543 F.3d 891, 900–01 (7th Cir. 2008) (citing *Engquist. v. Or. Dep't of Agric.*, 128 S.Ct. 2146, 2154–56 (2008)). The Plaintiff in the Complaint does not premise his § 1983 equal protection claim on the "class of one" theory, and the Court does not understand his claim to be so premised. The Complaint alleges that the Defendants "violated [the Plaintiff's] equal protection rights . . . by treating him differently based on religion" and that the Defendants' actions "were intentional, willful, and in reckless disregard of [the Plaintiff's] clearly established rights as protected by the Fourteenth Amendment." (Am. Compl. ¶¶ 43, 44.)

2009). A plaintiff may rely on either direct or circumstantial evidence that the adverse employment action was motivated by discriminatory purpose. *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 781 (7th Cir. 2007). "'Circumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Sun v. Bd. of Trs. of Univ. of Ill.,* 473 F.3d 799, 812 (7th Cir. 2007)). The plaintiff must come forward with evidence from which a rational trier of fact could reasonably infer that the plaintiff suffered an adverse employment action because he "was a member of a protected class." *Jennings v. Ill. Dep't of Corr.,* 496 F.3d 764, 767 (7th Cir. 2007). The Seventh Circuit has observed that "[o]ne type of circumstantial evidence that can demonstrate intentional discrimination is evidence that 'employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Jones*, 554 F.3d at 671 (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005)). A plaintiff may satisfy his burden under the direct method "by constructing a convincing mosaic of circumstantial evidence." *Phelan v. Cook County,* 463 F.3d 773, 779 (7th Cir. 2006). However, the "focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008).

Under the burden-shifting method, a plaintiff must establish a *prima facie* case of discrimination by showing: (1) that he is a member of a protected group; (2) that he was meeting the employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that another similarly situated person who was not a member of the protected class was

treated more favorably than the plaintiff. *Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 750-51 (7th Cir. 2006). If the plaintiff establishes a *prima facie* case, a presumption of discrimination is raised, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id.* at 751. If the defendant meets this burden, then the plaintiff must present evidence that the defendant's stated reason is merely a pretext for discrimination. *Id.* A plaintiff can satisfy this burden either "directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Sarsha v. Sears Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir. 1993). The ultimate burden of persuasion remains with the plaintiff at all times. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993).

A common factor to both the direct method and the indirect method is that the plaintiff suffer an adverse employment action. In this case, there is no dispute that the Plaintiff's employment was terminated, and thus he has suffered an adverse employment action. It is unclear from the materials submitted by the parties precisely what the Plaintiff's religious commitments and practices are, but the concept of religion is quite broad. *See Reed v. Great Lakes Cos.*, 330 F.3d 931, 933–34 (7th Cir. 2003) (finding that atheism is a form of religion and that "religion" under Title VII includes antipathy to religion). In any event, the Plaintiff was not a member of Defendant Mosley's Christian church and exhibited some lifestyle choices and conduct that Defendant Mosley showed to be inconsistent with his belief system. Under Seventh Circuit precedent, religion is pretty broad, and thus, the Plaintiff's religion (or irreligion) is a characteristic that makes him a member of a protected group.

Under the direct method, the Plaintiff has come forward with evidence showing that Defendant Mosley made religion a factor in the workplace, that he disagreed strongly with the Plaintiff's lifestyle, that Defedant Mosley explicitly and repeatedly judged the Plaintiff's lifestyle based upon religious grounds, and that Defendant Mosley's religious views and moral judgments were never far from his evaluation of the Plaintiff. Similarly, the Plaintiff has come forward with evidence showing that Defendant Mosley responded to the Plaintiff's objection to his religious instruction and moral judgments with a command to "keep [his] mouth shut," and with threats to "drop it or you will be dealt with on paper," and to "stop complaining or you will lose your job." (Pl.'s Ex. E at 5–6, DE 47-19.) From these facts, a jury could reasonably infer that Defendant Mosley, possessed by discriminatory motive, terminated the Plaintiff's employment and influenced the decision of Mayor Handshoe and the Board of Public Works and Safety.

Under the indirect method, the Plaintiff has come forward with evidence showing that he was meeting his employer's legitimate job expectations. He pointed to two relatively recent favorable employment evaluations, his recent receipt of eight hours of compensatory time for his good work as an employee, and the passage of almost sixteen months since he had received a verbal or written warning. He also brought forward evidence of another similarly situated person (Troy Climie, another distribution operator) who was not a member of the protected class (Climie went to Defendant Mosley's church) and who was treated more favorably than the Plaintiff. There is evidence that Climie had a recent altercation with Clerk's office staff and that he yelled at and hung up the telephone on Defendant Mosley, but that Climie was not disciplined. The Defendants have articulated (and supported with evidence) nondiscriminatory

reasons for the termination of the Plaintiff's employment—he was insubordinate, violated policy, and hung up the telephone on Defendant Mosley. The Plaintiff has presented evidence that the Defendants' stated reasons are merely pretext for discrimination. Defendant Mosley's threats to discipline or fire him for objecting to Defendant Mosley's religious instructions and moral judgments and his retention of the Plaintiff's disciplinary record beyond the three-year expungement period show triable issues of fact regarding whether the Defendants were more likely than not motivated by a discriminatory reason. Mayor Handshoe referenced the Plaintiff's pattern of conduct and the failure of attempts to counsel and coach the Plaintiff, but this explanation depends upon Defendant Mosley's presentation of the Plaintiff's employment history, which raises credibility issues, especially in light of the sixteen or so months that had passed without any verbal or written warning and the two positive employment evaluations.

For these reasons, the Court finds that genuine issues of material fact remain regarding the Plaintiff's claims of intentional religious discrimination under Title VII and the Equal Protection Clause, and the Defendants are not entitled to summary judgment on these grounds.

**B.      The Plaintiff's § 1983 Claim Against the City**

The Defendants argue that the City cannot, under a theory of *respondeat superior*, be held liable on the Plaintiff's § 1983 claim. The Plaintiff urges that he suffered a constitutional injury, that the City can be held responsible because Defendant Mosley and Mayor Handshoe had final policy-making authority and made a joint decision to terminate his employment, and that Mayor Handshoe served as a conduit for Defendant Mosley's bias in making the termination

decision. The Defendants in reply argue that the Board of Public Works and Safety is the final policy-making authority and that the Board did not discriminate on the basis of religion.

Section 1983 does not establish a system of vicarious responsibility, and thus the doctrine of *respondeat superior* cannot be utilized to hold local governmental units liable for § 1983 violations. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 694 (1978) (holding that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). A municipality may only be held liable under § 1983 when its "policy or custom" results in a constitutional injury to the plaintiff. *See id.* at 694. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise. To establish a basis for municipal liability under § 1983, a plaintiff must show (1) that the municipality had an express policy that, when enforced, causes a constitutional deprivation; (2) that the municipality had a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) that the plaintiff's constitutional injury was caused by a person with final policy-making authority. *Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005).

There appears to be no dispute among the parties that two grounds (express policy and widespread practice/custom) are not at issue. Instead, the parties dispute whether Defendant Mosley and Mayor Handshoe or the Board of Public Works and Safety possessed final policy-making authority. The parties have not presented the applicable state law that would help to resolve this dispute. *See Garrison v. Burke*, 165 F.3d 565, 572 n.6 (7th Cir. 1999) (stating that "[w]hether an officer has final policy making authority is a question of state law"). Furthermore, Mayor Handshoe has stated that she is "charged with holding all City employees to the standards

18

set forth in the City of Kendallville Employee Handbook," and a copy of that Handbook is attached to her Affidavit. (Handshoe Aff. ¶ 5, DE 44-6.) She has also stated that the termination decision was a "joint decision" of her and Defendant Mosley. (Handshoe Aff. ¶ 9, DE 44-6.) The Employee Handbook does not offer much help in resolving this dispute. It sets forth policies that apply in discipline situations, when "the Employer determines an employee may be suspended, reduced in pay or position, or terminated." (Handbook, DE 44-6 at 37–43.) The term "employer," however, refers generically to "the City of Kendallville, Indiana," and not to the Board of Public Works and Safety or the mayor. (Handbook, DE 44-6 at 7.) The Handbook provides a Complaint Procedure that permits an employee to file a complaint, which is reviewed initially by the immediate supervisor. The Complaint Procedure permits the employee to seek the department head's review of the immediate supervisor's response, and then the Board of Public Works and Safety's review of the department head's response. The decision of the Board of Public Works and Safety is "final and binding on all parties." (Handbook, DE 44-6 at 43.) This permissive review process of employee complaints does not definitively resolve the dispute whether the Board of Public Works and Safety, Mayor Handshoe, or Defendant Mosley was the final policy-making authority. Finally, the Board's minutes indicate the Board upheld Defendant Mosley's termination the Plaintiff's employment. Although the Defendants may ultimately be able to establish that there is no basis for municipal liability on the Plaintiff's § 1983 claim, it has not done so on the record as it presently stands, and thus the Court will deny the Defendants' Motion for Summary Judgment in this respect.

**C.     The Defendants' Claim of Qualified Immunity for Defendant Mosley**

The Defendants argue that Defendant Mosely is entitled to qualified immunity because the Plaintiff cannot demonstrate a constitutional violation and point to any law that was clearly established that he patently ignored. The Plaintiff contends that Defendant Mosley violated the Plaintiff's constitutional right not to be discriminated against on the basis of religion and that a reasonable person would have known that a public employee could not be discharged based on his failure to conform to a superior's religious beliefs.

In evaluating claims under § 1983, courts must determine whether the official acting under color of state law is entitled to qualified immunity. Qualified immunity operates to shield officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("[I]n light of pre-existing law the unlawfulness must be apparent."); *Leaf v. Shelnutt,* 400 F.3d 1070, 1080 (7th Cir. 2005). It does not protect individual officers, however, if they (1) violate clearly established law (2) that a reasonable officer should know. *See Harlow,* 457 U.S. at 818. Nevertheless, qualified immunity is broad and provides protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Qualified-immunity claims are resolved by considering the two factors set out in *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *see also Purtell v. Mason,* 527 F.3d 615, 621 (7th Cir. 2008). When evaluating a claim of qualified immunity, district courts consider whether the plaintiff has demonstrated the deprivation of a constitutional right. *Pearson v. Callahan,* 129 S.Ct. 808, 815–16 (2009); *Saucier,* 533 U.S. at 201. District courts also determine whether the right was

clearly established at the time of the alleged violation or if a reasonable official, in light of the clearly established law, could have believed that his conduct was lawful. *Pearson*, 129 S.Ct. at 816; *Saucier,* 533 U.S. at 201. Qualified immunity is a fact-intensive analysis. *See Inenco v. City of Chi.,* 286 F.3d 994, 1001 (7th Cir. 2002). In considering whether a constitutional violation occurred, courts examine the facts in a light most favorable to the party asserting an injury. *Saucier,* 533 U.S. at 201. A violation is sufficiently apparent if it "would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202 (citing *Wilson v. Layne,* 526 U.S. 603, 615 (1991)).

The Court has found that genuine issues of material fact exist as to the Defendant Mosley's alleged violation of the Plaintiff's equal protection rights. When the Plaintiff's employment was terminated in 2006, it was clearly established, and a reasonable person would have known, that a public employee could not be discharged based on his failure to conform to a superior's religious beliefs. *See Baker v. Washington Bd. of Works*, Civ. No. 99-0642-C-T/G, 2000 WL 33252101, at *5 (S.D. Ind. June 8, 2000) (citing *Venters v. City of Delphi*, 123 F.3d 956, 970–71 (7th Cir. 1997)). Furthermore, Defendant Mosley testified that he knew he was prohibited from taking any action that would violate an employee's right to religious freedom and that he could not discriminate against a subordinate employee because the employee's religious beliefs are different from his. For these reasons, the Defendants' Motion for Summary Judgment will be denied as to the Defendants' claim of qualified immunity for Defendant Mosley.

**CONCLUSION**

For the foregoing reasons, the Court now GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [DE 44]. The Defendants' Motion is granted as to the Plaintiff's defamation claim and any harassment/hostile work environment claim, but it is denied as to the Plaintiff's intentional religious discrimination claims under Title VII and § 1983. Additionally, the Motion is denied as to the Defendants' claim that there is no basis for municipal liability and that Defendant Mosley is entitled to qualified immunity. Finally, the Plaintiff's Title VII discrimination claim against Defendant Mosley, in his individual capacity, is DISMISSED.

SO ORDERED on March 31, 2009.

S/ Theresa L. Springmann
THERESA L. SPRINGMANN, JUDGE
UNITED STATES DISTRICT COURT